**Kevin BROWNING, by his next friend, Linda BROWNING, and Linda Browning, individually, Plaintiffs–Respondents,**

v.

**Lawrence H. WHITE, Defendant,**

and

**Dwayne CORBETT and the City of Rolla, Missouri, Defendants–Appellants.**

No. 20795.

Missouri Court of Appeals,
Southern District,
Division One.

March 13, 1997.

Joy R. Urbom, Evans & Dixon, St. Louis, for defendants–appellants.

No appearance for plaintiffs-respondents.

GARRISON, Judge.

Kevin Browning and Linda Browning (Plaintiffs) sued the City of Rolla, Missouri (City); a Rolla police officer, Dwayne Corbett (Corbett); and Lawrence White (White) in a three-count petition. Counts I and III, which were against all three defendants, sought damages for conversion of a truck, and for deprivation of constitutional rights under color of state law in violation of 42 U.S.C.A. § 1983, respectively. Count II was against White only and sought rescission of a contract.[1] This is an appeal by both the City and Corbett from adverse judgments entered by the trial court after a trial without a jury.

Pursuant to Rule 73.01(c), the judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously applies or declares the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976). Under this standard, appellate courts should exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the judgment is wrong. *Id.* Considerable deference is accorded judgments turning on evidentiary and factual evaluations by the trial court, but no such deference is given when the law has been erroneously declared or applied. *In re Marriage of Fry,* 827 S.W.2d 772, 775–76 (Mo.App. S.D.1992).

On August 12, 1992, Kevin Browning (Kevin) purchased a 1967 Ford pickup from White, giving him $200 cash, a 1968 Chevro-

---

1. Count II was dismissed by Plaintiffs at the conclusion of the case.

let pickup which White valued at $600, and a $1,000 promissory note signed by Kevin and his mother, Linda Browning (Mrs. Browning). The note called for monthly payments of $100 with the balance due on June 12, 1993. The title application was in Kevin's name and listed White as the lienholder.

According to White, he went to the Browning residence on September 12, 1992 to collect the monthly payment. Apparently he was unsuccessful because he then went to the Rolla Police Department and requested that an officer accompany him to the Browning property "to keep the peace" while he repossessed the truck. Corbett was summoned by the dispatcher, and, according to White, he showed Corbett his copy of the title application reflecting his lien and a copy of the promissory note.

Corbett drove to the Browning home in his patrol car where he met White. The '67 Ford pickup was at the side of the house, and as White and Corbett walked onto the property, they were met by Mrs. Browning. All witnesses agreed that White did not have a court order to take the truck; Corbett was in full uniform, with handcuffs, a revolver and a walkie-talkie on his belt; Mrs. Browning was upset, yelled, and apparently would have hit White if Corbett had not stepped between them; White argued with Mrs. Browning; White eventually went out to the street at Corbett's direction; Corbett radioed the dispatcher to send a tow truck at White's request; and a tow truck arrived and towed the '67 pickup from the Browning property to White's property in Salem, Missouri, for which White paid $75. Much of what transpired thereafter was disputed.

Mrs. Browning testified that Corbett told her he was there to help White get his truck back; he told her to take White to court when she asked him if a court order was necessary to take the truck; when she asked Corbett for his help to keep White from taking the truck, Corbett told her that he could not do anything about it because White had "the paper and the lien"; she thought of calling the police, but realized that they were already there in the person of Corbett; when she asked Corbett what would have happened if she had hidden the truck, he said

"that wouldn't have been a pretty sight"; and Corbett kept saying, "Calm down and back up. Don't get in the way." Mrs. Browning also said that when she sat in the truck, Corbett took her by the arm and said, "You know you have to get out or else."

According to Corbett, White told him that he had been threatened by Mrs. Browning, and he wanted an officer there to keep the peace and witness what happened when he went to get the truck. Corbett told White that he could go to the Browning property only for the purpose of keeping the peace and witnessing the events, but he could not take sides. According to him, White asked him to radio the tow truck company used by the City, which he did after telling White that he would be responsible for all charges. He disputed the statements attributed to him by Mrs. Browning, except he did say that he told her and White to calm down more than once. He denied that he ever took possession of the truck or instructed the towing company about what to do with it.

White testified that he made the request for an officer to accompany him while he repossessed the truck after unsuccessfully attempting to collect the payment which was due. According to White, Mrs. Browning became upset, said that she was not going to pay for that "pile of junk," and that she did not know how she was going to get it out of her drive. He also said that Corbett tried repeatedly to calm Mrs. Browning down and threatened to arrest her if she did not do so.

After White testified, he consented to a judgment on Counts I and III in the amount of $50,000, but Plaintiffs agreed not to execute on it in return for the payment of $850. All of the evidence was presented in Plaintiffs' case. The City and Corbett filed a motion for a judgment at the conclusion of Plaintiffs' evidence, which was overruled. The court entered judgment against White for $50,000; against Corbett for $7,500; against the City for $7,500; and jointly against Corbett and the City for attorneys' fees in the amount of $7,500.

In the first point on appeal, the City complains about the trial court's decision that it was not protected from the conversion claim

by the doctrine of sovereign immunity. This point refers to the following portion of the trial court's conclusions of law:

10. The actions of [White] and [Corbett] resulted in a conversion of Plaintiffs' property.

11. The City of Rolla does not enjoy a sovereign immunity for acts of conversion committed by its employees who are carrying out its official policies, customs and practices.

12. To the extent the City of Rolla enjoys sovereign immunity for acts of conversion by its employees, it has waived such immunity by carrying a liability insurance policy providing a coverage for injuries resulting from the acts and conduct of [Corbett] on September 12, 1992.

The City argues that in Missouri a municipality is immune from claims for conversion or other intentional torts committed by its employees. It also argues that Plaintiffs did not plead the existence of insurance coverage as a waiver of sovereign immunity, and in any event, the insurance policy admitted in evidence did not provide coverage for the acts in question.

■ The City contends that the finding in paragraph 11 is an erroneous declaration and/or application of the law, and cites several cases in support of its argument that intentional torts are included in the protection of sovereign immunity. Those cases are *Mitchell v. Village of Edmundson,* 891 S.W.2d 848, 850 (Mo.App. E.D.1995) (involving a claim for conversion where the court said that "[i]ntentional torts have consistently been found to fall within the shield of sovereign immunity"); *Balderree v. Beeman,* 837 S.W.2d 309, 316 (Mo.App. S.D.1992) (this court applied sovereign immunity in a suit for slander); *Duncan v. Creve Coeur Fire Protection Dist.,* 802 S.W.2d 205, 207 (Mo. App. E.D.1991) (applying sovereign immunity under § 537.600, RSMo 1986, to a claim for intentional infliction of emotional distress); *Conrod v. Missouri State Highway Patrol,* 810 S.W.2d 614, 617–18 (Mo.App. S.D.1991) (holding that a claim for conversion was precluded by the doctrine of sovereign immunity); and *Carmelo v. Miller,* 569 S.W.2d 365,

367–68 (Mo.App. E.D.1978) (holding that sovereign immunity applied to a claim for assault and battery and false imprisonment).

Pursuant to § 537.600,[2] sovereign immunity applies unless the claim is for injuries resulting from the operation of motor vehicles or the condition of an entity's property. *State ex rel. Cass Med. Ctr. v. Mason,* 796 S.W.2d 621, 622 (Mo.banc 1990). Because neither exception applies here, we agree that the sovereign immunity doctrine applies to Plaintiffs' claim for conversion in Count I.

The trial court found, however, that even if sovereign immunity applied to the conversion claim, the City waived that immunity by carrying liability insurance providing coverage for the claim. This refers to evidence that the City had coverage under a policy of self insurance issued to all participating members of the Missouri Intergovernmental Risk Management Association (MIRMA).

■ Section 537.610.1 authorizes the purchase of liability insurance by political subdivisions to protect them from tort claims. It further provides that:

Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions of this section and in such amount and for such purposes provided in any self-insurance plan duly adopted by the governing body of any political subdivision of the state.

This provision "provides an independent basis for waiving sovereign immunity—a basis cemented in the existence of coverage for the damage or injury at issue under the language of the insurance policy." *State ex rel. Cass Med. Ctr. v. Mason,* 796 S.W.2d at 624. Statutory provisions which waive sovereign immunity, however, must be strictly construed. *Id.* at 623. This is because sovereign immunity is the rule and not the exception. *Bartley v. Special Sch. Dist. of St. Louis County,* 649 S.W.2d 864, 868 (Mo.banc 1983).

2. All references to statutes are to RSMo 1994, unless otherwise noted.

■ The City contends in its point relied on that, contrary to the trial court's judgment, its purchase of insurance should not have been found to constitute a waiver of the sovereign immunity doctrine for two reasons. First, it contends that Plaintiffs did not plead the existence of the insurance coverage as a waiver.[3] Secondly, it contends that the insurance coverage in question did not operate as a waiver of sovereign immunity by reason of the policy language and the provisions of § 537.610. As a result of our decision relating to the second reason, we need not discuss the first.

In the instant case, the MIRMA policy provided, in part:

> MIRMA agrees to indemnify the Member for all sums which the Member shall be obligated to pay by reason of liability imposed upon the Member by law or assumed by the Member under contract or agreement, for damages direct or consequential, and expenses ... on account of ... damage to or destruction of property or the loss of use thereof, arising out of any occurrence happening during the period of membership.

Under this provision, if the policy provided coverage to the City for these claims, it was required that the City be obligated to pay them "by reason of liability imposed upon [it] by law."

In *State ex rel. Cass Med. Ctr. v. Mason*, 796 S.W.2d at 623–24, suit was filed against a county hospital based upon a claim which would otherwise have been precluded by the sovereign immunity doctrine pursuant to § 537.600.1. Although the hospital had purchased insurance coverage which provided protection for "all sums which the insured shall become legally obligated to pay as damages," the court concluded that it "was never 'legally obligated to pay' because its liability falls under the sovereign immunity of section 537.600.1." *Id.* at 623. The same result was

reached in *Balderree v. Beeman*, 837 S.W.2d at 318.

In the instant case, the insurance policy in question provided coverage only if the City was "obligated to pay by reason of liability imposed upon [it] by law." The claim, however, was one for which it had sovereign immunity pursuant to § 537.600.1. We see no meaningful distinction, for the purpose of determining if there has been a waiver of the sovereign immunity doctrine, between the policy language here and that found in *Cass County Med. Ctr.* and *Balderree*. Accordingly, the existence of the insurance policy in question did not constitute a waiver of sovereign immunity for the conversion claim.

Based on the above, we hold that the trial court erred in entering a judgment against the City on the claim for conversion in Count I.

In their second point, both the City and Corbett contend that the trial court erred in entering a judgment against them on the conversion claim. They contend that there was insufficient evidence to support a finding that they took possession of, or intended to exercise control over, the truck. Alternatively, Corbett contends that he was entitled to "official immunity" from the claim. We need not discuss this claim as it relates to the City because we have already determined that the trial court erred in entering a judgment against it on the conversion claim.

■ A conversion is the unauthorized assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owner's rights. *Ware v. McDaniel*, 899 S.W.2d 170, 173 (Mo.App. W.D.1995). "It may be proved in one of three ways: (1) by tortious taking; (2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to rights of owner; or (3) by refusal to give up possession to owner on demand." *Id.*

---

**3.** This claim relates to the City's contention that Plaintiffs failed to plead the existence of insurance coverage as a waiver of the sovereign immunity doctrine, and that when they offered evidence about that coverage, the trial court should have sustained the City's objection that it was beyond the scope of the pleadings and excluded the evidence. Following the introduction of evidence, Plaintiffs were permitted to file an amended petition, over Defendants' objections, which alleged for the first time that the City had waived sovereign immunity by insuring its employees for tortious acts committed in the course of their employment.

Corbett argues that, according to his testimony, he never had possession of the truck, did not intend to exercise control over it, did not enjoy any benefit from "a possession of the pickup," did not direct the tow truck driver to take control of the pickup, and did not direct that the truck be taken to city property. He then says:

> The credible evidence demonstrated that Officer Corbett merely stood by to keep the peace. Based on the credible evidence adduced at trial, Plaintiffs failed to make a submissible case against ... Officer Corbett ... under state law conversion, and the trial court's contrary ruling must be reversed.

On appeal, the trial court's judgment is presumed valid, and the burden is on the appellant to demonstrate that it is incorrect. *Tri–State Motor Transit Co. v. Holt,* 921 S.W.2d 652, 656 (Mo.App. S.D.1996). It is not proper for this court to become an advocate for the appellant and search for a basis to challenge the trial court's findings. *Id.*

We are required to accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Behen v. Elliott,* 791 S.W.2d 475, 476 (Mo.App. E.D.1990). Corbett has not demonstrated under that standard why a judgment against him for conversion was not supported by the evidence. See *Stone Machinery Co. v. Kessler,* 1 Wash.App. 750, 463 P.2d 651, 655 (1970)(holding that similar conduct by a sheriff amounted to "constructive force, intimidation and oppression constituting a breach of the peace and conversion of the defendant's tractor").

In arguing that the "credible" evidence resulted in there not being a submissible case for conversion, he invites us to make credibility determinations. In doing so, he overlooks the fact that it is the function of the trial court to decide the weight and value to be given to the testimony of witnesses. *Bradley v. Bradley,* 880 S.W.2d 376, 379 (Mo.App. W.D.1994). It may believe all, part or none of the testimony of any witness. *In re Adoption of W.B.L.,* 681 S.W.2d 452, 455 (Mo.banc 1984). Corbett, therefore, has failed to demonstrate, under the applicable standard of review, why a judgment against him for conversion was not supported by sufficient evidence.

Corbett alternatively claims that even if a judgment for conversion was supported by the evidence, he is protected by the doctrine of official immunity. In this regard, we note that while the doctrine of sovereign immunity may shield public entities from tort liability, it does not extend to individual officials acting as the entity's agent. *Larabee v. City of Kansas City,* 697 S.W.2d 177, 180 (Mo.App. W.D.1985). Rather, the doctrine of official immunity protects a public officer or employee from tort liability for negligently performing a discretionary duty, as opposed to a ministerial duty. *Id.*

"Whether an act is discretionary depends on the degree of reason and judgment it requires, judged by such factors as the nature of the official's duties, the extent to which policymaking or professional expertise is involved, and the likely consequences of withholding immunity." *Heins Implement Co. v. Missouri Highway & Transp. Comm'n,* 859 S.W.2d 681, 695 (Mo.banc 1993). "[A] discretionary act requires 'the exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or course pursued.'" *Kanagawa v. State,* 685 S.W.2d 831, 836 (Mo.banc 1985)(quoting *Jackson v. Wilson,* 581 S.W.2d 39, 43 (Mo.App. W.D. 1979)). In *Sherrill v. Wilson,* 653 S.W.2d 661, 667 (Mo.banc 1983), the court cautioned the courts not to construe the term "discretionary" too narrowly in applying the doctrine of official immunity.

In contrast, ministerial duties are those of a clerical nature which an officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed. *Kanagawa v. State,* 685 S.W.2d at 836.

In the instant case, Corbett was asked to accompany White to keep the peace while he repossessed a truck. Obviously, keeping the peace is one of the duties of a police officer. Doing so in a situation such as

this requires the exercise of discretion and judgment, as no two situations are the same.

There is a distinction, however, between keeping the peace and participating in a self-help repossession after there has been a breach of the peace. Here, Corbett testified that it was obvious that the peace was being breached within seconds after their arrival at the Browning residence. He described Mrs. Browning as loud and out of control, resulting in him telling her to calm down more than once. He also stepped between Mrs. Browning and White once or twice, telling both of them to calm down, and eventually telling White to stand in the street. All of these measures could be construed as discretionary acts by Corbett in an effort to maintain the peace.

The same cannot be said, however, concerning Mrs. Browning's testimony that Corbett told her he was there to help White get his truck back; that he kept telling her to back up and not get in the way; that he called for a tow truck; that he took her arm and told her that she had to get out of the truck; and that he stayed on the property until the tow truck took the pickup away. Instead of these actions being restricted to efforts to maintain the peace, they could be construed as furthering the repossession of the truck after there had been a breach of the peace. The conversion claim against Corbett was based on his efforts in assisting in the repossession of the truck, not his efforts to merely keep the peace.

Section 400.9–503 permits a secured party to proceed without judicial process in taking possession of property "if this can be done without breach of the peace." The clear effect of this is that such efforts to gain possession by self-help must cease in the event the peace is breached. While Corbett's efforts to maintain the peace could reasonably be categorized as discretionary, we are unable to conclude that the same was true concerning his assistance in repossessing the pickup, especially after a breach of the peace was evident. At that point, he no longer had discretion to assist in the repossession of the truck. In keeping with the definition of ministerial duties, Corbett was required to cease those efforts after the

peace was breached, without regard to his judgment or opinion concerning the propriety of his actions.

■ In *Bachmann v. Welby*, 860 S.W.2d 31 (Mo.App. E.D.1993), the court said:

> Official immunity exists because "fear of personal liability should not hang over public officials as they make judgments affecting the public safety and welfare." Without this immunity, the public interest "will inevitably suffer from the too complacent attitude thus engendered."

*Id.* at 33 (citations omitted). In the instant case, Corbett's assistance in the repossession of the pickup after the peace was breached did not constitute "judgments affecting the public safety and welfare." We conclude, therefore, that under these facts, Corbett's actions in assisting in the repossession of the pickup were not protected by official immunity. The second point is denied.

■ In point three, the City contends that Plaintiffs failed to make a submissible case on their § 1983 claim, and the trial court therefore erred in overruling its motion for judgment at the close of the evidence. It argues that in order for Plaintiffs to prevail on their § 1983 claim against the City, they were required, but failed, to prove the existence of an unconstitutional policy, custom or practice by the City which caused the acts complained of.

A City does not enjoy immunity from a § 1983 action. *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 663, 690, 98 S.Ct. 2018, 2022, 2035–36, 56 L.Ed.2d 611 (1978). *Respondeat superior*, however, is not a basis for holding a municipality liable under § 1983. 436 U.S. at 663, n. 7, 98 S.Ct. at 2022, n. 7. As described in *Monell*, § 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." 436 U.S. at 692, 98 S.Ct. at 2036. The "official policy," however, may be embodied in a governmental "custom" even though "such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* In *Monell*, the court concluded:

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. at 694, 98 S.Ct. at 2037–38.

In the instant case, the trial court found:

9. The actions of [Corbett] in assisting with the taking of the 1967 Ford pickup were consistent with the official policies, customs and practices of the City of Rolla Police Department regarding self-help repossessions.

Evidence concerning the existence of "official policies, customs and practices" concerning self-help repossessions consisted of Corbett's testimony that: (1) from time to time he and other officers are called upon to keep the peace, including situations involving repossessions; (2) he was informed by his "field training officer" about what they were and were not allowed to do in repossession situations; (3) he did not do anything at the Browning residence which violated what his field training officer had told him with regard to repossession situations; (4) there are written policies of the Rolla Police Department which he has read; (5) he did nothing at the Browning residence which violated any written policy of the Rolla Police Department; (6) to the best of his knowledge his actions at the Browning residence were within the Rolla Police Department policy; and (7) he was following the standard procedures and policies of the Rolla Police Department in going to the Browning residence with White.

Even if some of Corbett's actions at the Browning residence were determined to be in violation of Plaintiffs' constitutional rights, it is readily apparent that there was no evidence to support a finding that the City of Rolla had an adopted policy or established custom authorizing those acts. There was no evidence about the contents of any written policy which had been adopted by the City, or that any such policy applied to assisting in self-help repossessions. Likewise, there was no evidence about the authority of the "field training officer" or that he ever gave any directives concerning "self-help" repossessions. Only those municipal officials who have final policymaking authority may by their actions subject the entity to § 1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986)).

In order to establish a "custom" for the purposes of § 1983 liability, a plaintiff may prove the existence of a widespread practice which, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law. *City of St. Louis v. Praprotnik*, 485 U.S. at 126–28, 108 S.Ct. at 926. The evidence here is also insufficient, under these guidelines, to establish a "custom" with regard to self-help repossessions which would expose the City to liability. The only evidence was that Corbett and other officers were called upon from time to time to keep the peace in repossession situations. There was no evidence that any of those instances involved "self-help" repossessions, involved conduct which was violative of the constitutional rights of any of the participants, or that any of the City's officials with policymaking authority were aware of, much less adopted or approved, any unconstitutional conduct during any prior instances. *See City of St. Louis v. Praprotnik*, 485 U.S. at 128–32, 108 S.Ct. at 927–28.

Under these circumstances, we conclude that the trial court erred in holding that the City was liable for the § 1983 claim because of a policy, custom or practice.

The fourth point relied on is based on alleged error in denying the motions of Corbett and the City for a judgment at the close of the evidence and in entering a judgment for Plaintiffs on their § 1983 claim. In this point, it is contended that the "weight of the credible evidence established that [Corbett] was present at the Brownings' home merely to stand by and keep the peace." Alternatively, Corbett alleges that he is entitled to qualified immunity from the § 1983 claim.

We have already concluded that there was insufficient evidence to support a judgment against the City on the § 1983 claim. This point is, therefore, moot as to the City.

■ The first portion of this point, as it relates to Corbett, impliedly recognizes that a police officer's actions in intervening and aiding in a repossession may constitute state action in depriving a party of his rights. In fact, Corbett acknowledges case law such as *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir.1981), where the court concluded that "there may be a deprivation within the meaning of § 1983 not only when there has been an actual 'taking' of property by a police officer, but also when the officer assists in effectuating a repossession over the objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising his legal right to resist a repossession."

Corbett, however, argues that his testimony concerning the nature and extent of his involvement in the repossession was more credible than that of Mrs. Browning. Therefore, he contends that the trial court should have believed his testimony that he did not take sides, that he was there only to keep the peace, that he did not tell Mrs. Browning that he was there to assist in the repossession, and that he did not restrain Mrs. Browning or prevent her from resisting the taking of the truck.

As indicated earlier, in a court-tried case credibility assessments are generally for the trial court, which may disbelieve testimony even when uncontradicted. *Robinson v. Estate of Robinson*, 768 S.W.2d 676, 676–77 (Mo.App. S.D.1989). The trial court was entitled to, and obviously did, believe the testimony of Mrs. Browning concerning the nature and extent of Corbett's involvement in the repossession. That testimony was sufficient to support a finding of liability under § 1983 pursuant to *Harris*. The first portion of this point is without merit.

■ Corbett also contends that he is entitled to qualified immunity. Such an immunity applies to § 1983 claims to protect government officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Miller v. Smith*, 921 S.W.2d 39, 48 (Mo.App. W.D. 1996). The qualified immunity defense should fail if the law which was violated was clearly established at the time of the conduct in issue because a reasonably competent public official should know the law governing his conduct. *Harlow*, 457 U.S. at 817–19, 102 S.Ct. at 2738. The function of the qualified immunity rule is to excuse an officer who makes a reasonable mistake in the exercise of his official duties. *Brewer v. Trimble*, 902 S.W.2d 342, 344 (Mo.App. S.D.1995).

Once again, however, Corbett assumes that the trial court was required to believe his testimony that he only attempted to keep the peace and that his only involvement was to calm the parties, step between them, and call for a tow truck at White's request. He argues that it was reasonable for him to believe that his presence to keep the peace was lawful, and that simply requesting a tow truck for White did not rise to the level of state action. As indicated earlier, however, the trial court was entitled to believe testimony to the effect that Corbett had a much more direct involvement in the repossession.

■ "[A] debtor has a right to minimal due process (i.e., notice and prior hearing) before a state may assist a secured creditor in repossessing the debtor's property." *Harris v. City of Roseburg*, 664 F.2d at 1125. There was evidence that White had a lien on the pickup. As indicated earlier, a secured party may proceed without judicial process in taking possession of property "if this can be done without breach of the peace." § 400.9–503. *See also Gill v. Mercantile Trust Co.*, 347 S.W.2d 420, 424 (Mo. App. E.D.1961). "The duty to repossess property in a peaceable manner is specifically imposed on a secured party by the UCC and is intended to protect debtors and other persons affected by repossession activities." *Robinson v. Citicorp Nat. Services, Inc.*, 921 S.W.2d 52, 54 (Mo.App. E.D.1996).

Here, it was undisputed that this was an extra-judicial repossession. Corbett admit-

ted that, within a short time of their arrival at the Browning residence, there was what he called a breach of the peace. He also acknowledged that there was loud talk, Mrs. Browning was out of control, he had to tell her to calm down several times, and he had to step between Mrs. Browning and White to prevent a physical altercation. He even admitted telling White to get off the property as a result of Mrs. Browning's demand, but he stayed on the property until the repossession was complete.

Under these circumstances, we are constrained to hold that there was sufficient evidence from which the trial court could have concluded that Corbett's involvement in this extra-judicial repossession was such that it amounted to state action, and that he was not entitled to the protection of qualified immunity. Corbett's third point is, therefore, denied.

In the fifth point, the City and Corbett attack the separate $7,500 judgments entered against each of them. They contend that the judgments were duplicative; they were entitled to, but did not, receive credit for the $850 settlement with White; and that the evidence was insufficient to support the amount of the judgment against either of them.

The first portion of this point (that the judgments against the City and Corbett were duplicative) is moot because of our conclusion that the judgment against the City must be reversed. There is remaining, however, the $7,500 judgment against Corbett.

■ Corbett claims that he was entitled to an $850 setoff because of Plaintiffs' settlement with White. We agree. Section 537.060 provides, in pertinent part:

> When an agreement by release . . . or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury . . . such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.

Accordingly, the judgment against Corbett should be reduced by the amount of $850.

Corbett also claims that the judgment against him was unsupported by the evidence. In this regard, it is apparent from the trial court's findings of fact and conclusions of law that it found against Corbett on both the conversion and § 1983 claims.

■ The measure of damages on a conversion claim is generally the reasonable market value of the property at the time of the conversion. *Lacks v. R. Rowland & Co., Inc.*, 718 S.W.2d 513, 520 (Mo.App. E.D. 1986). Consequential damages for loss of use are limited to the period it would take a reasonable person to replace the property converted. *Ware v. McDaniel*, 899 S.W.2d at 173.

■ Here, the trial court found that Plaintiffs lost the value of the "1968 Chevrolet pickup"[4] (which it set at $600), the $200 down payment, and the loss of use from the date of the conversion (September 12, 1992) until the date of the judgment (December 29, 1995). There was no evidence, however, concerning how long it would have taken to replace the truck. In fact, Mrs. Browning testified that the truck was for Kevin's use, and that she had her own vehicle. Kevin did not testify.

The trial court obviously found for Plaintiffs on their § 1983 claim also. While damages based on the abstract value or importance of constitutional rights are not permissible in § 1983 cases, compensatory damages may include those for personal humiliation, mental anguish and suffering. *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307–10, 106 S.Ct. 2537, 2543–45, 91 L.Ed.2d 249 (1986). In the instant case, Mrs. Browning testified that her neighbors came out of their homes to witness the events in issue, and she requested damages for embarrassment and humiliation. Appellants raise no issue about the sufficiency of the evidence to support an award for those damages.

4. There is no issue about the propriety of the measure of damages applied by the trial court in this regard.

While there was insufficient evidence to support the awarding of damages for loss of use, under the issues submitted to us, we cannot conclude that the trial court erred in setting the total amount of damages. Point five is, therefore, denied except, as indicated, Corbett should receive a setoff against the judgment in the amount of $850.

The sixth, and final, point relied on is directed to the trial court's judgment for attorneys' fees for the prosecution of Plaintiffs' § 1983 claim. The City and Corbett contend that the award was excessive, likely included charges for duplicative services, and that Plaintiffs failed to prove the fees were reasonable. The relief requested is a reversal, or, if liability under § 1983 is affirmed, that this court modify the award, or remand the case with directions to reconsider the issue of attorneys' fees.

The attorney fee award in issue was a joint judgment against the City and Corbett in the total sum of $7,500. We have already concluded that the judgment against the City on the § 1983 claim must be reversed. In order to be entitled to attorney fees on a § 1983 claim, a party must obtain an enforceable judgment against the defendant from whom fees are sought. *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). Therefore, the judgment against the City for attorneys' fees must be reversed.

42 U.S.C.A. § 1988(b) permits the court, in its discretion, to award a "reasonable" attorney fee to the prevailing party in a § 1983 action. The initial estimate of a reasonable attorney fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). Adjustments may then be necessary in a particular case. *Id.* The trial court should exclude from its fee calculation hours that were not "reasonably expended," such as fees for excessive work or that which was redundant or otherwise unnecessary. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

In the instant case, Corbett argues that the only evidence about the amount of time expended on the case was in an affidavit submitted by one of Plaintiffs' two lawyers. In that affidavit, the attorney stated that his hourly rate was $100, that he had obtained a "summary" of his co-counsel's time spent on the case which was 50.7 hours (the summary was not offered in evidence), and he attached an itemization of his time and expenses which totaled 39.9 hours and $396 respectively. There was no evidence concerning the nature or reasonableness of the services rendered by the other attorney.

Corbett argues that the services of Plaintiffs' attorneys were at least duplicative. For instance, he points out that the attorney who made the affidavit included time for attending depositions and trial, even though the other attorney took the depositions and tried the case.

In its findings of fact and conclusions of law, the trial court found that Plaintiffs would not have been compensated for their § 1983 claim had they not retained counsel, and that the two attorneys representing them are entitled to $7,500 for the prosecution of the § 1983 claim. It made no findings indicating how it arrived at that amount.

An appellate court reviews the trial court's decision on attorney fees to determine if there was an abuse of discretion. *Gates v. Deukmejian,* 987 F.2d 1392, 1396 (9th Cir. 1992). A meaningful appellate review of an award of attorney fees requires a concise but clear explanation of the trial court's reasons for the fee award. *Hensley v. Eckerhart,* 461 U.S. at 436–38, 103 S.Ct. at 1941; *Brewer v. Trimble,* 902 S.W.2d at 346. More is required than a bald, unsupported amount. *Brewer v. Trimble,* 902 S.W.2d at 346.

Accordingly, we are unable to review the matter of attorney fees. *See Brewer v. Trimble,* 902 S.W.2d at 346. It is necessary, therefore, that the award of attorneys' fees be reversed and the case remanded to the trial court. If the trial court, upon further consideration, chooses to make no change in the amount awarded as attorneys' fees, it is directed to provide a concise, clear explanation of the reasons for the award.

In reviewing the matter of attorney fees, the trial court may consider such matters as

the fact that we have reversed the liability judgment against the City on the § 1983 claim with the result that Plaintiffs have not prevailed on the entire claim (*see Farrar v. Hobby*, 506 U.S. at 113–14, 113 S.Ct. at 574; *Brewer v. Trimble*, 926 S.W.2d 686, 689 (Mo. App. S.D.1996)); whether the claim for attorneys' fees includes time which constituted a duplication of services; and whether the time expended by the attorneys included time for matters unrelated to the § 1983 claim, including the pleaded rescission claim against White.

The judgment against the City is reversed; the judgment against Corbett for attorneys' fees is reversed and the case is remanded to the trial court for further proceedings in accordance with this opinion; on remand, the trial court is directed to amend the judgment against Corbett by reducing it in the sum of $850; otherwise the judgment is affirmed.

BARNEY, P.J. and PREWITT, J. concur.